## THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Roderick Lyke,                  )
                               )
           Plaintiff,      )
                               )     Case No. 21 C 50066
            v.            )
                               )     Hon. Iain D. Johnston
Dr. Lank, et al.,           )
                               )
           Defendants.    )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Roderick Lyke, formerly an inmate at Dixon Correctional Cetner, brought this suit pursuant to 42 U.S.C. § 1983, alleging that he was subjected to deliberate indifference to a serious medical condition for the post-operative care he received for a broken hand at Dixon Correctional Center from March 27, 2019, to June 3, 2019. Defendants Lank and Zahtz have moved for summary judgment (Dkt. 100), arguing that the totality of care provided to Plaintiff entitles them to summary judgment as there is no record of deliberate indifference.[1] Defendant Varga has moved for summary judgment (Dkt. 112) arguing that Warden Varga had no personal involvement in Plaintiff's medical care and that based on *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009), Defendant Varga was entitled to rely on the judgment of the medical personnel at the prison in their treatment of Plaintiff. Because the record provides no evidence of deliberate indifference under the totality of care provided to Plaintiff, the motions for summary judgment are granted.

---

[1] Defendant Lank also argues she is entitled to summary judgment because the record is devoid of evidence establishing she had any personal involvement in Plaintiff's care.

**BACKGROUND**

**I.** **Northern District of Illinois Local Rule 56.1**

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this court. The rule is intended "to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal citation omitted.) Local Rule 56.1(a) requires the moving party to provide a statement of material facts that complies with Local Rule 56.1(d). LR 56.1(a)(2). Local Rule 56.1(d) requires that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." LR 56.1(d)(2).

The opposing party must then respond to the movant's proposed statements of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); LR 56.1(e). In the case of any disagreement, "a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003).

Because Plaintiff is proceeding *pro se*, Defendants served him with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. (Dkt. 105, 116.) Additionally, the Court ordered Defendants to provide Plaintiff with a complete copy of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1 as well as a statement consistent with

*Lewis v. Faulkner*, 689 F.2d 100 (7th Cir. 1982). (Dkt. 98). Plaintiff failed to timely respond to the motions and the Court gave him additional time, although his request was also untimely (Dkt. 120). Ultimately, Plaintiff submitted a response directly to Defendants that was then (by order of the Court) separately docketed as his response (Dkt. 122, 123). Plaintiff's response does not address any of Defendants' statements of fact (except by way of argument) and is not supported by exhibits (Dkt. 123). The Court will consider Plaintiff's response only to the extent it is supported by the record or to the extent it contains information about which Plaintiff could properly testify. *See James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) (citing Fed. R. Civ. P. 56(c)(4)); *Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); Fed. R. Evid. 602. The Court will not look beyond any cited material, however. *See Johnson v. Cambridge Indus.*, *Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them."). Where Plaintiff has not properly responded to Defendants' statements of fact, the Court will accept them as true to the extent supported by the record. *Lamz*, 321 F.3d at 683 (7th Cir. 2003).

The Court is mindful that failure to strictly comply with Local Rule 56.1, or indeed to respond at all to a motion for summary judgment, does not automatically warrant judgment in favor of the moving party. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (moving party has "ultimate burden of persuasion" to show entitlement to judgment as a matter of law). The Court will apply these standards in evaluating the evidence.

## II.    Relevant Facts[2]

Plaintiff, Rodrick Lyke, is a former inmate in the custody of the Illinois Department of Corrections at the Dixon Correctional Center ("Dixon"). (Defs. Lank and Zahtz L.R. 56.1

---

[2] Subject-matter jurisdiction is proper under 28 U.S.C. § 1346(b)(1), and venue is proper under 28 U.S.C. § 1402(b).

Statement (Dkt. 101), ¶ 1.) Defendant, Dr. Merrill Zahtz, is a licensed medical doctor who worked for Wexford Health Sources, Inc. as a medical director at the Dixon from October 2017 through March 29, 2022, providing medical care and treatment to inmates. (*Id*. ¶ 2.) Defendant, Dr. Nancy Lank, was employed by Wexford Health Sources, Inc. as a traveling medical director, serving at Dixon from April 2018 to April 2019. (*Id*. ¶ 3.)

Immediately before his incarceration at Dixon, Plaintiff was detained at the Cook County Jail, followed by the Northern Reception Center ("NRC"). (*Id*. ¶ 4.) While at the Cook County Jail, Plaintiff broke his right hand during a fight. (*Id*. ¶ 5.) Plaintiff underwent a surgical repair of his hand at the John Stroger Hospital in Chicago, Illinois on or about March 7, 2019. (*Id*. ¶ 6.) Plaintiff received Tylenol #3 immediately following his hand surgery. (*Id*. ¶ 7.) On March 11, 2019, Plaintiff had a follow-up appointment with his orthopedist, Dr. Doscher, who noted that the pins placed during the surgery were in place and the bone in Plaintiff's hand was in good alignment. (*Id*. ¶ 8.) Dr. Doscher noted that from March 11, 2019, it may take six weeks before the pins would be removed. (*Id*.)

Plaintiff was transferred to the Dixon Correctional Center on or about March 27, 2019. (*Id*. ¶ 9.) On or about March 29, 2019, Plaintiff was seen in the health care unit for an intake assessment, at which the nurse noted that Plaintiff had had surgery on his right hand around February 2019. (*Id*. ¶ 10.) On the morning of March 29, 2019, Plaintiff also saw a nurse regarding the injury to his right hand. (*Id*. ¶ 11.) During this visit, Plaintiff told a nurse that he had injured his right hand while playing basketball, and the nurse noted that it was still in a cast. (*Id*.) During this initial conversation Plaintiff attempted to "make light of [his] injury." (*Id*.) The nurse did not note that Plaintiff was complaining of any pain at that time and gave him a cold-pack and Ibuprofen. (*Id*.)

4

When he arrived at Dixon Plaintiff already had an active prescription for Tylenol 325mg. (*Id*. ¶ 12.) Plaintiff received a refill of his Tylenol 325mg on March 18, 2019, which was then increased to 500 mg on April 2, 2019, refilled on May 15, 2019, and then the frequency of the dosage was increased on June 13, 2019. (*Id*. ¶ 13.)

During the evening of March 29, 2019, Plaintiff returned to the health care unit requesting a low bunk permit due to his right arm being in a cast. (*Id*. ¶ 15.) Plaintiff was then issued a low bunk permit. (*Id*. ¶ 16.)

On March 31, 2019, another nurse noted that Plaintiff was scheduled to see a nurse practitioner for a chronic care clinic. (*Id*. ¶ 17.) On or about April 2, 2019, Plaintiff saw Nurse Practitioner Kristina Mershon for a chronic care clinic for his chronic asthma. (*Id*. ¶ 18.)

Plaintiff was not in any acute distress at that time. (*Id*.) N.P. Mershon noted that Plaintiff's right hand was still in a cast following surgery. (*Id*.) On April 2, 2019, Plaintiff was also provided a six-month low bunk permit, so he would not have to climb to a top bunk with his hand in a cast. (*Id*.)

On May 2, 2019, Plaintiff saw a nurse in the health care unit regarding his complaints of pain in his surgically repaired right hand. (*Id*. ¶ 20.) Plaintiff reported limited mobility and a throbbing pain in his hand for a few days before the appointment. (*Id*. ¶ 21.) The nurse referred Plaintiff to Dr. Zahtz for an assessment of his hand. (*Id*. ¶ 22.)

On May 2, 2019, Dr. Zahtz saw Plaintiff for the first time. (*Id*. ¶ 23.) During the exam, Plaintiff stated that he had an on-and-off pain in his right hand, which had worsened over the preceding several days. (*Id*.) Plaintiff also reported that his cast was loose and that the pins in his hand were causing an increase in pain in his hand. (*Id*.) Plaintiff told Dr. Zahtz he was taking Motrin as needed. (*Id*.)

In the medical records memorializing the examination, Dr. Zahtz noted that Plaintiff's vital signs were stable. (*Id*. ¶ 24.) Dr. Zahtz also noted that Plaintiff's right upper extremity was in a short-arm cast, and that Plaintiff had some visible sutures under his cast, which seemed slightly loose. (*Id*.) Dr. Zahtz observed that Plaintiff had good range of motion in the fingers on his right hand and had good capillary refill in his fingers. (*Id*.) Dr. Zahtz assessed Plaintiff as being status-post small finger metacarpal open reduction internal fixation with percutaneous pinning. (*Id*. ¶ 25.) Dr. Zahtz's plan for future care was to refer Plaintiff for a follow-up evaluation with his orthopedist, Dr. Doscher, at Stroger Hospital, for possible removal of the pins in his hand, if necessary. (*Id*. ¶ 26.) To address Plaintiff's complaints of pain, Dr. Zahtz prescribed for Plaintiff Naproxen 500mg and Ibuprofen 500mg. (*Id*. ¶ 27.)

On May 2, 2019, Dr. Zahtz also reviewed Plaintiff's records from Stroger Hospital for the first time and discussed them in detail with Plaintiff. (*Id*. ¶ 29.) This was the first time Dr. Zahtz learned about the history of Plaintiff's injury to his right hand, his hand surgery, and that he had yet to have a follow-up appointment at Stroger Hospital for the same. (*Id*.) Immediately following this May 2, 2019, appointment, Dr. Zahtz submitted a referral request to have Plaintiff sent back to Dr. Doscher's office at Stroger Hospital for a postsurgical follow-up and removal of the cast and pins in his right hand, if needed. (*Id*. ¶ 30.) Dr. Zahtz did not have another appointment with Plaintiff after May 2, 2019. (*Id*. ¶ 31.)

On May 8, 2019, Dr. Zahtz participated in a collegial review regarding the referral request for Plaintiff to see his orthopedist at Stroger Hospital. (*Id*. ¶ 32.) During a collegial review, the prison medical director confers with a utilization management physician employed by Wexford Health Sources, Inc. to discuss the medical necessity of any requested off-site or specialty medical services for an inmate. (*Id*. ¶33.) During these collegial reviews, the inmate's medical history,

pertinent medical records, and referral request are discussed and considered. (*Id*. ¶ 34.) Based on this information and collegial discussion, a medical decision is made as to whether a referral request for off-site or specialty treatment is medically necessary for an inmate. (*Id*. ¶ 35.) On May 8, 2019, a Wexford Utilization Management physician approved Dr. Zahtz's referral request to send Plaintiff to his orthopedist at Stroger Hospital for a follow-up regarding his hand. (*Id*. ¶ 36.)

On June 3, 2019, Plaintiff returned to Dr. Doscher's office at Stroger Hospital. (*Id*. ¶ 37.) Dr. Doscher noted that Plaintiff's pinning sites and sutures were clear, and there was no evidence of edema, erythema, or drainage. (*Id*.) He also noted that Plaintiff could almost make a complete fist. (*Id*.) Dr. Doscher discontinued Plaintiff's cast, pins, and stitches. (*Id*. ¶ 38.) He instructed Plaintiff to work on improving his range of motion and to remain non-weight bearing ("NWB") in his right upper extremity for at least four more weeks. (*Id*.) Dr. Doscher's office recommended that Plaintiff follow-up as needed ("PRN") and did not schedule any further follow-up appointments. (*Id*. ¶ 39.)

Dr. Zahtz's May 2, 2019, examination of Plaintiff's right hand indicated nothing warranting an emergent or urgent appointment to remove the cast and pins, though Dr. Zahtz wanted the appointment at Dr. Doscher's office to occur as soon as his office was available. (*Id*. ¶ 41.) June 3, 2019, was apparently the earliest Dr. Doscher's office could accommodate a follow-ups appointment. (*Id*. ¶ 42.) Following the June 3, 2019, appointment, Plaintiff was referred to physical therapy for his hand, which he attended on-and-off for several months thereafter. (*Id*. ¶ 44.) Plaintiff was also provided additional Tylenol for any residual pain in his hand. (*Id*. ¶ 45.)

When a doctor at the Dixon wants to refer a patient off-site for treatment, the doctor first writes a referral request, which is then discussed between Wexford doctors and the prison's medical director. (*Id*. ¶ 55.) After a referral for off-site treatment is made, the referring staff at

Dixon play no further role in scheduling appointments with off-site care providers or transporting inmates to offsite treatment facilities. (*Id*. ¶ 56.) During their time at the Dixon Correctional Center, neither Dr. Zahtz nor Dr. Lank was involved in scheduling patients for off-site medical appointments. (*Id*. ¶ 57.) This task was delegated to the medical unit's writ office. (*Id*.) Upon approval of a referral request, the approval is sent to a scheduler in the writ office to process. (*Id*.) Neither Dr. Zahtz nor Dr. Lank had control over the schedules of off-site medical providers. (*Id*. ¶ 58.)

At no time did Dr. Zahtz turn Plaintiff away from the health care unit, disregard his complaints, or otherwise deny him medical care and treatment. (*Id*. ¶ 47.) Dr. Zahtz relied upon his objective examinations of Plaintiff, Plaintiff's subjective complaints, and his professional judgment always in treating Plaintiff. (*Id*. ¶ 48.) Plaintiff arrived at the prison with a surgically repaired right hand that was still in a cast and was still healing. (*Id*. ¶ 52.) On exam, Plaintiff's right hand was otherwise in good condition and was healing, and Plaintiff did not present with any deficits in his hand. (*Id*.)

Dr. Lank reviewed Plaintiff's medical records from the Illinois Department of Corrections and did not find any records of appointments she had with Plaintiff. (*Id*. ¶ 49.) Dr. Lank was not aware Plaintiff had a broken hand, underwent surgery to repair it, and was in a cast. (*Id*. ¶ 51.) Dr. Lank was not aware of any complaints Plaintiff had regarding his hand. (*Id*.)

At the time of his deposition, Plaintiff had not consulted with any physicians regarding any issues with his right hand. (*Id*. ¶ 53.) Plaintiff takes over the counter medications, including Tylenol and Ibuprofen and wears wrist braces as desired. (*Id*.) At the time of his deposition, Plaintiff was employed as a machine operator/machine operator trainer, with greater income than his earnings prior to his injury. (*Id*. ¶ 54.)

8

Defendant John Varga is an employee of the Illinois Department of Corrections and was the warden at Dixon Correctional Center from June 2016 to January 2020. (Def. Varga L.R. 56.1 Statement (Dkt. 113, ¶ 4.) Plaintiff has only interacted with Defendant Varga once, during which they discussed Plaintiff's medical concerns. (*Id*. ¶ 2, and see Ex. 1, pg. 50-53.) Plaintiff has no medical training or expertise. (*Id*. ¶ 3.) The record indicates that Plaintiff submitted multiple grievances between April 5, 2019, and May 29, 2019, complaining about ongoing pain and inadequate care. (Dkt. 113-2, pgs. 1-10.)

Between January 2018 to January 2020, John Varga's assistant wardens had signature authority as his designees for reviewing and responding to Dixon inmates' grievances. (Dkt. 113 ¶ 5.) Defendant Varga did not personally review or sign inmate grievances. (*Id*. ¶ 6.) In Defendant Varga's training and experience as warden of Dixon, his designees would review and sign grievance responses on his behalf and would determine if an individual in custody was being seen by Health Care Unit staff. (*Id*. ¶ 7.) Due to the substantial volume of institutional grievances that are presented to the warden's office on a daily basis at Dixon, it was not feasible for the warden, by himself, to review, investigate, and sign off on whether an individual's grievance should be denied or allowed. (*Id*. ¶ 8.)

Defendant Varga has no medical training and relies on the opinions of medical professionals regarding the treatment and care of offenders. (*Id*. ¶ 9.) Varga always deferred and delegated medical decisions and clinical judgment to the Health Care Unit staff. (*Id*. ¶ 10.)

Defendant Varga never reviewed inmates' medical records. (*Id*. ¶11.) The only time medical issues were brought directly to John Varga's attention was when an individual in custody was receiving no medical care at all. (*Id*. ¶ 13.) Defendant Varga has never seen any of Plaintiff's grievances before 2021. (*Id*. ¶ 15.) Defendant Varga did not have any authority to approve or

disapprove any therapeutic or medical care for Plaintiff. (*Id*. ¶ 16.)  Defendant Varga was not directly involved or responsible for the provision of any care to Plaintiff. (*Id*. ¶ 17.)

## DISCUSSION

### I. Summary Judgment Standard

On summary judgment, the Court must view the record in the light most favorable to the non-moving party and grant the motion if the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021); Fed. R. Civ. P. 56(a).  Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element that is essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial burden of showing the grounds for their motion. *Id*. at 323.  Once that party does so, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).  Mere "metaphysical doubt" is not enough. *Id*. (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).  A factual dispute is genuine when a reasonable jury could return a verdict in favor of the non-moving party. *Id*.

The Court must construe all facts in the light most favorable to the nonmoving party and draw all legitimate inferences in favor of that party. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).  "A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Id*.

## II.     Analysis

The Eighth Amendment right to be free from cruel and unusual punishment prohibits state officials and medical personnel from acting with deliberate indifference to an inmate's serious medical needs.  *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc). Deliberate indifference claims contain both an objective and a subjective component: the inmate must have an objectively serious medical condition and the defendant must be subjectively aware of and consciously disregard the inmate's serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

### A.     Objective Element—Serious Medical Condition

Defendants do not contest that Plaintiff suffered from an objectively serious medical condition, and the record reflects the fact that Plaintiff received repeated and ongoing care from medical personnel for his post operative care and the subsequent pain he suffered.  "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). A condition is also objectively serious if a "failure to treat [it] could result in further significant injury or the unnecessary and wanton infliction of pain." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (citation omitted).  Because Plaintiff's injury was the subject of ongoing treatment, including examinations, prescriptions for medication, adjusted for both dosage and frequency, physical therapy, and timely referral back to the orthopedist who performed the surgery on his hand for removal of the pins and cast, the Court finds that Plaintiff's injury qualifies as a serious medical condition.

### B. Subjective Element—Deliberate Indifference

For the subjective element, Plaintiff must show that medical personnel acted with deliberate indifference to his serious medical needs. *Estelle*, 429 U.S. at 105. Deliberate indifference is comparable to criminal recklessness. *Farmer*, 511 U.S. at 837. The official accordingly must both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. "The requirement of subjective awareness stems from the Eighth Amendment's prohibition of cruel and unusual punishment; 'an inadvertent failure to provide medical care cannot be said to constitute "an unnecessary and wanton infliction of pain."' *Zaya v. Sood*, 836 F.3d 800, 804-05 (7th Cir. 2016) (emphases in original) (*quoting Estelle*, 429 U.S. at 105).

Claims of negligence (even gross negligence), medical malpractice, or a patient's disagreement with a prescribed course of treatment are insufficient to meet this standard. *See, e.g., Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) ("Deliberate indifference requires more than evidence of negligence or medical malpractice.") (citations omitted); *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012); *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). Inmates "are not entitled to receive 'unqualified access to healthcare.'" *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "To survive summary judgment," an inmate "need[s] to present evidence sufficient to show that [a medical professional's] decision was 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (citation omitted).

The record indicates that Plaintiff received ongoing care beginning shortly after he arrived at Dixon on March 27, 2019. The fact that an inmate has received some treatment does not necessarily defeat a claim for deliberate indifference. To be sure, "[b]latantly inappropriate medical treatment" or persisting with a course of treatment healthcare providers know to be ineffective may be actionable under 42 U.S.C. § 1983. *Perez*, 792 F.3d at 777 (cleaned up). But a prison official "is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). When considering whether care evinces deliberate indifference to a serious medical need, the Court must examine the totality of an inmate's medical care. *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997).

The record indicates that Plaintiff arrived at Dixon on March 27, 2019, shortly after the surgery on his injured hand, and was examined by medical personnel on March 29, 2019. At that examination Plaintiff "ma[d]e light" of his injury. The nurse gave him a cold pack and ibuprofen for his pain. After the exam, Plaintiff was given a low bunk permit, so he did not have to climb into bed with his injured hand. The prescription Plaintiff had when he arrived at Dixon for Tylenol 325 mg was renewed.

Plaintiff scheduled another appointment with medical personnel on March 31, 2019, and he was seen by a nurse on April 2, 2019. At that appointment the nurse noted in the medical records that Plaintiff was in a cast, post-surgery, and that he was not in any acute distress. Following this appointment, Plaintiff's prescription for Tylenol was increased to 500 mg.

On May 2, 2019, Plaintiff saw a nurse for complaints of pain and limited mobility in his hand. The nurse referred Plaintiff to Dr. Zahtz. At the appointment with Defendant Zahtz, Plaintiff reported on-and-off pain that had increased over the prior few days. He reported to Defendant

Zahtz that he was taking pain medication as needed. Defendant Zahtz reviewed Plaintiff's medical records for the first time and discussed them with Plaintiff. On examination, Defendant Zahtz noted that Plaintiff's range of motion and blood flow to the injury were good. Defendant Zahtz changed Plaintiff's prescription for pain medication to include Naproxen 500 mg and Ibuprofen 500 mg.

Immediately after the May 2, 2019, exam, Defendant Zahtz submitted a referral request for Plaintiff to see his orthopedist at Stroger Hospital for surgical follow-up. On May 8, 2019, Defendant Zahtz participated in collegial review with Wexford Health Sources for the purpose of securing approval for Plaintiff's referral to the orthopedist. The referral was approved. On June 3, 2019, Plaintiff was taken to Stroger Hospital where he saw the orthopedist who examined the injured hand and determined that there was no evidence of infection, and that Plaintiff could make a complete fist. The orthopedist removed the pins, sutures and cast from Plaintiff's hand. Plaintiff was then prescribed physical therapy for his injury which he attended on and off for several months thereafter. Plaintiff's prescription for pain medication was increased on June 13, 2019.

Plaintiff appears to argue that there was delay in scheduling his referral to the orthopedist that resulted in injury. However, Defendant Zahtz performed the necessary collegial review and obtained approval for the referral within six days of his initial examination of Plaintiff. Plaintiff has provided no evidence that Defendant Zahtz (or any Defendant) was the cause of any delay. "Because the medical defendants had no control over the scheduling of the appointments, [Plaintiff] cannot claim that their failure to schedule him for surgery, or their failure to nag the residents, constituted objectively unreasonable conduct. *See Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (holding that summary judgment in favor of a defendant doctor was warranted where the plaintiff 'presented no evidence that ... delays were even within [the doctor's] control')."

14

*Turner v. Paul,* 953 F.3d 1011, 1016, (7th Cir. 2020). Thus, under the controlling case law, absent evidence in the record that any Defendant had control over the scheduling of the examination by the orthopedist, or otherwise establishing any delay, or injury due to delay, the record does not support any finding of deliberate indifference.

In light of the totality of care Plaintiff received, no reasonable factfinder could conclude that Plaintiff suffered deliberate indifference at the hands of Defendant Zahtz (or any other Defendant). The court examines the totality of the medical care provided and even if there were any isolated incidents of delay in treatment (which is not supported by the record) it does not rise to the level of deliberate indifference. *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000); *Gutierrez*, 111 F.3d at 1374-75. Accordingly, Defendants are entitled to summary judgment.

For the sake of completeness, the Court notes that with respect to Defendants Lank and Varga, both argue lack of personal involvement in Plaintiff's care as a basis for granting summary judgment on the claim of deliberate indifference. Section 1983 is premised on the wrongdoer's personal responsibility. To prevail under section 1983, Plaintiff must establish that an individual caused or participated in a constitutional deprivation to be held liable. *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012); *Pepper v. Vill. of Oak Park,* 430 F.3d 809, 810 (7th Cir. 2005). The record indicates that Plaintiff submitted multiple grievances between April 5, 2019, and May 29, 2019, complaining about ongoing pain and inadequate care. (Dkt. 113-2, pgs. 1-10.) With respect to personal involvement, questions of fact remain as to whether Defendant Lank and Defendant Varga were involved. Plaintiff identified Defendant Lank in his grievances about inadequate medical care, and in his deposition, Plaintiff testified that he spoke to Defendant Varga about his medical concerns (*see* Dkt. 113, pgs. 50-53.) However, based on the fact that the Court has determined that the totality of care supported by the record belies any finding of deliberate

indifference, the determination that questions of fact remain as to personal involvement by Defendants Lank and Zahtz do not impact the outcome and finding that the record supports a finding that Plaintiff was not subjected to deliberate indifference.

## CONCLUSION

Defendants' motions for summary judgment [100] [112] are granted. The Clerk is directed to enter final judgment. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1).[3] If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, Plaintiff could be assessed a "strike" under 28 U.S.C. § 1915(g).


DATE:  August 22, 2024

_____
Iain D. Johnston
United States District Judge

---

[3] Plaintiff need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Plaintiff wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

16